1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CERTAINTEED CORPORATION,

     Plaintiff,

   v.

SEATTLE ROOF BROKERS, et al.,

     Defendants.

CASE NO. C09-563RAJ

ORDER & PERMANENT INJUNCTION

## I.  INTRODUCTION

This matter comes before the court on four motions.  Three are summary judgment motions, two (Dkt. ## 27, 28) from Defendant James Garcia and one (Dkt. # 40) from Plaintiff CertainTeed Corporation ("CertainTeed").  CertainTeed has also filed a motion to compel discovery (Dkt. # 22), which Mr. Garcia did not oppose.  Mr. Garcia has not requested oral argument; CertainTeed requested oral argument solely on its motion for summary judgment.  The court finds oral argument unnecessary.  For the reasons stated below, the court DENIES Mr. Garcia's motions (Dkt. ## 27, 28), DENIES CertainTeed's discovery motion (Dkt. # 22) without prejudice, and GRANTS in part and DENIES in part CertainTeed's summary judgment motion (Dkt. # 40).  At the conclusion of this order, the court imposes a permanent injunction on Mr. Garcia and sets a new mediation deadline.

ORDER – 1

## II.  BACKGROUND

CertainTeed's roofing products division manufactures, among other things, asphalt shingles.  CertainTeed has been in this business for decades, although its product lines have evolved over time.  All asphalt shingles consist of a base layer coated on both sides with asphalt.  The asphalt typically has additives, including small pebble-like granules that give the shingle an exterior texture.

Asphalt shingles are either organic or fiberglass.  Organic shingles consist of an organic "felt" base made of paper or wood fiber, to which a top and back asphalt layer are applied.  Metz. Decl. (Dkt. # 32) ¶ 8.  Fiberglass shingles have a fiberglass base layer, and, in contrast to organic shingles, the top and back asphalt layers permeate the fiberglass base and join with each other.  *Id.* ¶ 9.  CertainTeed last made organic shingles in 2005.  Gardiner Decl. (Dkt. # 41) ¶¶ 6-8.  CertainTeed has manufactured fiberglass shingles since the 1960s, and continues to manufacture numerous fiberglass shingle product lines today.  *Id.* ¶ 7.  Among those fiberglass shingles are the "Presidential" and "Presidential TL" lines, which CertainTeed has sold since it acquired the brand from another manufacturer in 2000.  *Id.* ¶ 10.  The previous manufacturer began selling Presidential shingles in 1987.  *Id.* ¶¶ 10, 17.

James Garcia operates a sole proprietorship named Seattle RoofBrokers, although he sometimes uses similar trade names, such as Everett RoofBrokers or Tacoma RoofBrokers.  Garcia Decl. (Dkt. # 47-2) ¶ 1.  He owns www.seattleroofbrokers.com and similar internet domain names, and controls the content of a website at those addresses.  Because none of Mr. Garcia's roofing enterprises are incorporated, the court will refer to Mr. Garcia as the sole Defendant in this matter.

Although Mr. Garcia distributes information about roofing products, he is not himself a roofer and has never installed a roof.  Garcia Depo. at 24.[1]  He is not a licensed

---

[1] Excerpts from Mr. Garcia's deposition are found at Exhibit 2 to the first declaration of Adam Hughes (Dkt. # 35) and Exhibit 3 to the declaration of Brian Esler (Dkt. # 46).

ORDER – 2

1  contractor.  Garcia Depo. at 42.  Although he inspects his customers' roofing as it is

2  being installed, he is not an inspector.  Garcia Depo. at 54, 97-98.  Prior to 2000, he had

3  no roofing experience whatsoever.  Garcia Depo. at 18-22.  Beginning in 2000, he

4  worked for another roof "brokerage," a business that makes money by connecting

5  homeowners to roofers and retaining a portion of the cost of the roofing project.  He

6  started Seattle RoofBrokers in 2004 or 2005.  Although Mr. Garcia has refused to

7  disclose many of his business practices, he generates some portion of his business by

8  driving around neighborhoods in search of homes that he believes need new roofs.

9  Garcia Depo. at 60.  He then targets those homes with letters promoting his services.

10        Mr. Garcia attracted CertainTeed's attention as early as 2008, when CertainTeed's

11  regional representative, Mark Ivers, first received word from roofers that Mr. Garcia had

12  sent communications to their customers and prospective customers warning them of

13  problems with CertainTeed's asphalt shingles, including the Presidential products.  The

14  declaration of homeowner Devonda Fox is illustrative of Mr. Garcia's practices.  In 2009,

15  Ms. Fox contacted a roofer to receive a quote to replace the aging cedar shake roof on her

16  Everett home.  Fox Decl. ¶¶ 2-5.  After the roofer provided a quote, she received a letter

17  ("Fox Letter") in July 2009 from Seattle RoofBrokers.  The court reproduces the letter in

18  its entirety.

19        Dear Mr. & Mrs. Fox,

20        When it's time to re-roof, please talk to me before making any final
          decisions because I specialize in providing homeowners with *information
21        roofers don't want you to know*.  Initially we focus on providing the
          information you need to choose the right material (metal, rubber, cedar or
22        asphalt) then, whatever product you select, **we guarantee to save you
          money**.
23
24        I will provide an unbiased comparison between all available ***"architectural
          style"*** asphalt shingles.  There are significant differences in quality between
25        the products, but most homeowners never get the facts because roofers only
26        try to "sell" you the product they have already chosen to install.  I will help

27

28  ORDER – 3

you find the best value – by directing you to a shingle that is **twice as good as any other option.**

I will also provide unbiased information on the history of premature failure of ***"pumpkin tooth style"*** shingles.  All these products use the same basic design – connecting a multiple layer bottom section to a single layer base. All roofers know (or should know) these products cannot pass resale inspection after about fifteen years because the seam connecting the single layer base to the lower multiple layer pumpkin tooth section starts to split apart at that age.  The seam is the weak link in the product design.

I have enclosed a picture of a failing "Presidential Shake" there are six (6) areas where the seam is already splitting, allowing water to flow directly over the nailing area. And this roof is less than fifteen years old!

And, of course, I will also provide unbiased information on your ***"slate style"*** asphalt options.  I am sure you have questions – and I have all the answers.  Rest assured that, when it comes time for you to select a product, I will be your best resource of information on any/all roofing options.  **Call me for a free consultation and estimate.**

[Mr. Garcia's signature omitted.]

P.S.  Did you know that CertainTeed "pumpkin tooth" products (Presidential Shake, Presidential TL) and the Landmark series of shingles are currently part of a class-action lawsuit for premature failure?

Fox Decl., Ex. 1 (emphases in original).  Enclosed with the letter was a photograph of a section of an asphalt shingle roof, containing approximately 25 shingles.  The shingles are "pumpkin tooth" style, meaning that there is a rectangular "tooth" extending from the bottom of the main portion of the shingle.  Pumpkin tooth shingles create an appearance similar to cedar shake shingles.  Although it is difficult to tell from the reproductions of the photograph provided to the court, it appears that some of the shingles in the photograph have horizontal cracks running along their upper exposed portions.

Mr. Garcia sent a similar letter in autumn 2009 to Stuart Schell ("Schell Letter"), a homeowner in Snohomish.  Unlike Ms. Fox, Mr. Schell received his letter after his home

ORDER – 4

had already been reroofed with Presidential shingles.  Schell Decl. ¶¶ 1-6, Ex. 1.  The letter to Mr. Schell included the www.seattleroofbrokers.com address in its signature line.

Mike Daniels, an experienced Seattle-area roofer, was contacted by a customer for whom he had provided a quote.  Daniels Decl. ¶¶ 2-4.  The customer had spoken to a friend who had received one of Mr. Garcia's letters, and was concerned about using Presidential products.  *Id.*  Mr. Daniels then contacted Mr. Garcia, acting as if he was a customer interested in putting a new roof on a cabin.  *Id.* ¶¶ 6-11.  When Mr. Daniels said he was considering using Presidential TL shingles, Mr. Garcia told him that Presidential shingles rarely last more than ten years from their installation date, and that CertainTeed used fillers in its shingles that shortened their life expectancy.  *Id.* ¶¶ 8.

Mr. Ivers received calls from the roofers whose customers learned of Mr. Garcia's letters, and was asked to speak directly to the customers in an attempt to allay their fears about CertainTeed products.  Ivers Decl. (Dkt. # 45) ¶¶ 18-25.  In one incident, a roofer provided Mr. Ivers a copy of a different letter ("Dear Homeowner Letter") that a customer had received from Mr. Garcia in 2008:

Dear Homeowner,

I was in your development today to meet with one of your neighbors and noticed all your cedar roofs are being replaced with CertainTeed Presidential "pumpkin tooth" style asphalt shingles.  My first impression of the situation in your development is that the HOA did not understand the quality (or history) of "pumpkin tooth" style asphalt shingles in general and specifically the CertainTeed Presidential line of products.

*I suspect the HOA was not told that CertainTeed is currently in a class-action lawsuit (again) for marketing "defective" roofing shingles – and that the Presidential TL is a named product in the class-action suit.*

*I suspect the HOA was not told that this product (or any "pumpkin tooth" style product) will not be able to pass a resale inspection after 15 to 20 years – because the seam connecting the single base layer to the multiple layer "pumpkin tooth" starts to split apart at that age.*

ORDER – 5

> *I suspect the HOA did not even ask to see any 15 year old "pumpkin tooth" installations before requiring homeowners to purchase a product <u>with a history of premature failure.</u>*
>
> It is unfortunate that in their obvious attempt to maintain existing property values within the development, the HOA approved a roofing product that is actually of lower quality than the typical "old growth" treated cedar shake… which is still available today.  [remainder of letter omitted]

Ivers Decl. (Dkt. # 45), Ex. 1 (emphases in original).  The Dear Homeowner Letter included no photograph.  Again, Mr. Ivers invested substantial time in convincing the customer that the statements in the letter were false.  *Id.* ¶¶ 7-17.

The Seattle RoofBrokers website contains similar attacks on asphalt shingles generally and on CertainTeed products.  As of May 2010, the website named the Presidential TL, Presidential Shake, and other CertainTeed products as targets of "over 20 class-action lawsuits for shingles manufactured between 1987 and 2008."  Esler Decl. (Dkt. # 46), Ex. 1 (CT00853).  He contends that there are numerous "examples" of CertainTeed asphalt roofs failing within six to fifteen years, but does not cite the source of those examples.  *Id.* (CT00854).  He states that "one roofing contractor reports submitting over 600 warranty claims to CertainTeed within the last 4 years," but provides no substantiation for that assertion.  *Id.*  He contends that "most roofs fail in 10 to 15 years," *id.*, again without substantiation.

The content of Mr. Garcia's website shifts over time.  When CertainTeed filed this lawsuit in April 2009, the website contained no specific references to CertainTeed other than to list it as one of many asphalt shingle manufacturers.  Esler Decl., Ex. 4.  When the court visited the website on June 10, 2010, it contained many references to CertainTeed, but the vast majority of those references discussed the terms of CertainTeed's warranties.  The website also contained a single citation to CertainTeed's interrogatory responses in this lawsuit.  CertainTeed filed at least three versions of portions of the website in various declarations.  For purposes of this order, the court focuses on the April 2009 version and

ORDER – 6

1  the May 2010 version.  Esler Decl. (Dkt. # 46), Ex. 1 (May 2010 version), Ex. 4 (Apr.

2  2009 version).

3  CertainTeed sued Mr. Garcia in April 2009, challenging Mr. Garcia's practices on

4  a variety of legal grounds.  CertainTeed now seeks summary judgment on its Lanham Act

5  and Washington Consumer Protection Act ("CPA") false advertising claims.  It also

6  contends that it is entitled to permanent injunctive relief.  It has also challenged Mr.

7  Garcia's failure to provide adequate discovery responses.  Mr. Garcia has submitted two

8  partial summary judgment motions.

9  ### III.  ANALYSIS

10  The parties' summary judgment motions require the court to draw all inferences

11  from the admissible evidence in the light most favorable to the non-moving party.

12  *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is

13  appropriate where there is no genuine issue of material fact and the moving party is

14  entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party must

15  initially show the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*,

16  477 U.S. 317, 323 (1986).  The opposing party must then show a genuine issue of fact for

17  trial.  *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The

18  opposing party must present probative evidence to support its claim or defense.  *Intel

19  Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).  The

20  court defers to neither party in answering legal questions.  *See Bendixen v. Standard Ins.

21  Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

22  In this motion, CertainTeed challenges many of Mr. Garcia's statements as false

23  advertising in violation of the Lanham Act and the CPA.  The challenged statements

24  appear either on Mr. Garcia's website or in letters that he has sent to Seattle-area

25  homeowners.  It is not always clear precisely which statements CertainTeed targets.

26  After reviewing CertainTeed's motion and its proposed order granting that motion, it

27  appears that the following statements are at issue:

28  ORDER – 7

1)  Presidential shingles' "real functional life . . . is only 10-15 years," as stated in the Dear Homeowner Letter;

2)  Presidential shingles "will not be able to pass a resale inspection after 15 to 20 years," as stated in the Dear Homeowner Letter, and that "most roofs fail in 10 to 15 years," as stated in the May 2010 version of Mr. Garcia's website;

3)  Presidential shingles have "a history of premature failure," as stated in the Dear Homeowner Letter;

4)  the roof in the photograph that Mr. Garcia included in the Fox Letter and the Schell Letter actually depicts Presidential shingles; and

5)  Presidential shingles have been the subject of class action suit, as stated in various versions of Mr. Garcia's website and in each of the letters before the court.

## A.  CertainTeed Fails to Demonstrate that Several of Mr. Garcia's Statements Were Made "in Commerce" Within the Scope of the Lanham Act.

CertainTeed devotes most of its motion to the assertion that the statements it targets are false advertising in violation of the Lanham Act.  The Lanham Act prohibits, among other things, the "use in commerce" of "false or misleading description[s] of fact" or "false or misleading representation[s] of fact" that "misrepresent[] the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activity."  15 U.S.C. § 1125(a)(1).

CertainTeed focuses almost exclusively on the falsity of Mr. Garcia's statements, ignoring the threshold requirement that the statements be "use[d] in commerce."  As the Ninth Circuit observed in *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 n.3 (9th Cir. 1997), Congress amended the Lanham Act in 1988 to require that the false advertisement itself be used in interstate commerce.

Mr. Garcia's statements on his website were made in interstate commerce.  The internet, by its nature, is accessible by an interstate audience.  *Healthport Corp. v. Tanita*

ORDER – 8

*Corp. of Am.*, 563 F. Supp. 2d 1169, 1180 (D. Or. 2008) (holding that statements made on website were advertisements placed into interstate commerce); *Trafficschool.com, Inc. v. Edriver, Inc.*, 633 F. Supp. 2d 1063, 1074 (C.D. Cal. 2008) (same).  By referring to CertainTeed products and other asphalt shingles that are sold in interstate commerce, Mr. Garcia draws an interstate audience, and thereby places his website statements within the ambit of the Lanham Act.

It is not at all clear, by contrast, that Mr. Garcia's statements in letters to Washington homeowners come within the scope of the Lanham Act.  Mr. Garcia, a Washington resident, sent those letters to other Washington residents.  Although Mr. Garcia has not revealed everyone to whom he sent letters, there is no suggestion that he targeted anyone other than Washington homeowners.

CertainTeed's sole attempt to address the interstate commerce requirement as to Mr. Garcia's letters is to cite two cases that either were decided before the 1988 Lanham Act amendments or rely on pre-1988 precedent.  CertainTeed SJ Mot. at 21.  No Ninth Circuit precedent squarely addresses the post-1988 interstate commerce requirement.  The Third Circuit did so in *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160 (3d Cir. 2001).  The *Highmark* court concluded that a false advertisement in a Pennsylvania newspaper was made in interstate commerce even though it was undisputedly targeted at Pennsylvania residents and concerned health plans sold solely to Pennsylvania employees.  *Id.* at 165-66.  The court observed that the newspaper itself was distributed in interstate commerce, that the health plans in some cases permitted out-of-state beneficiaries and out-of-state care, and that the effect of the false statements could cross state lines.  *Id.*  Without determining which of these findings were necessary or sufficient, the court concluded that the false statements were made in interstate commerce.  *Id.*

This case is different, in that Mr. Garcia's letters were not likely to reach out-of-state residents.  Moreover, although CertainTeed sells its products nationwide, there is no

ORDER – 9

1    reason to assume that Mr. Garcia's letters would have an impact on sales outside

2    Washington.

3         In this case, the only obvious nexus to interstate commerce is that Mr. Garcia used

4    the United States Postal Service to send the letters.  *See United States v. Nader*, 542 F.3d

5    713, 717-18 (9th Cir. 2008) (noting that United States mail is a "facility in interstate

6    commerce").  The Lanham Act defines "commerce" broadly to include "all commerce

7    which may be lawfully regulated by Congress."  15 U.S.C. § 1127.  The use of the mails

8    is plainly within the scope of Congress's regulatory authority, and it is thus possible that

9    Mr. Garcia's use of the mail is by itself sufficient to bring his letters within the scope of

10   the Lanham Act.  *But see Licata & Co. Inc. v. Goldberg*, 812 F. Supp. 403, 409

11   (S.D.N.Y. 1993) (concluding that the language of § 1125(a) "reflects a legislative

12   judgment that for the statute to apply, the questioned advertising or statements, and not

13   merely the underlying commercial activity, must be disseminated in commerce – i.e., not

14   be purely local").

15        The court declines to decide at this time whether Mr. Garcia's letters can be the

16   subject of a Lanham Act claim.[2]  As noted, CertainTeed scarcely addressed the interstate

17   commerce requirement, and Mr. Garcia's opposition brief does not mention it at all.

18   Fortunately for CertainTeed, the CPA gives it a route to relief that bypasses the Lanham

19   Act's interstate commerce requirement.

20        A private party bringing a CPA claim must prove five elements:  "(1) an unfair or

21   deceptive act or practice, (2) that occurs in trade or commerce, (3) a public interest, (4)

22   injury to the plaintiff in his or her business or property, and (5) a causal link between the

23   unfair or deceptive act and the injury suffered."  *Indoor Billboard/Washington, Inc. v.*

---

[2] Some courts have questioned whether letters directly targeting a particular customer can serve
as the basis of a Lanham Act claim.  *E.g.*, *Garland Co. v. Ecology Roof Sys. Corp.*, 895 F. Supp.
274, 279 (D. Kan. 1995) (holding that a letter disparaging competing roofer sent to one customer
was not advertising within the scope of the Lanham Act).  In this case, although Mr. Garcia has
not revealed the scope of his letter-writing campaigns, it is apparent that he regularly uses letters
like the ones in the record as a means of obtaining business.  The Lanham Act reaches this
conduct.

ORDER – 10

1    *Integra Telecom, Inc.*, 170 P.3d 10, 17 (Wash. 2007) (citing *Hangman Ridge Training*

2    *Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986)).  Courts

3    considering CPA claims must take guidance from "final decisions of the federal

4    courts . . . interpreting the various federal statutes dealing with the same or similar

5    matters."  RCW § 19.86.920.  To that end, there is no question that false advertising

6    within the scope of the Lanham Act (except perhaps for its interstate commerce

7    requirement) is an unfair or deceptive practice within the scope of the CPA.  There is no

8    question that Mr. Garcia's letters were made in trade or commerce and that they caused a

9    business injury to CertainTeed.  *Mason v. Mortgage Am., Inc.*, 792 P.2d 142, 148 (Wash.

10   1990) (noting that a CPA plaintiff need not prove monetary damages to prove that it

11   suffered a business injury).  The only question is whether the statements made in the

12   letters implicate a public interest.

13          The court finds that Mr. Garcia's letters satisfy the public interest requirement for

14   a CPA claim.  By analogy, trademark infringement, another Lanham Act violation, is

15   usually, but not always, conduct that satisfies the CPA's public interest requirement.

16   *Seattle Endeavors, Inc. v. Mastro*, 868 P.2d 120, 127 (Wash. 1994) (citing and

17   distinguishing *Nordstrom, Inc. v. Tampourlos*, 733 P.2d 208 (Wash. 1987)).  In this case,

18   Mr. Garcia's letters are part of a concerted campaign to influence the roofing decisions of

19   an unknown number of Washington homeowners.  Given that Washington has declared

20   by statute that certain roofing practices "substantially affect the public interest," the court

21   concludes that Mr. Garcia's letters do so as well.  RCW 19.186.050 (declaring violations

22   of RCW Ch. 19.186 to be CPA violations).

23   **B.    Mr. Garcia Has Made False Statements that Violate the CPA and the
            Lanham Act.**

24

25          The elements of a Lanham Act false advertising claim are as follows:

26          (1) a false statement of fact by the defendant in a commercial advertisement
            about its own or another's product; (2) the statement actually deceived or

27          has the tendency to deceive a substantial segment of its audience; (3) the

28   ORDER – 11

deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Southland Sod*, 108 F.3d at 1139 (footnote omitted).  Not all elements apply in every case.  Proof that an advertisement actually deceived a substantial segment of its audience is necessary only where the statement is merely misleading, rather than false.  *William H. Morris Co. v. Group W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995) (citing *Johnson & Johnson-Merck v. Rhone-Poulenc Rorer*, 19 F.3d 125 (3d Cir. 1994)).  This is an important distinction, because a plaintiff typically must rely on consumer survey evidence or other evidence of the audience-wide impact of a defendant's advertising in order to prove that a "substantial segment" of that audience was misled.  *William H. Morris*, 66 F.3d at 258 (misleading 3% of audience insufficient); *Johnson & Johnson*, 19 F.3d at 129-30.  Only where a plaintiff proves that a defendant advertised with the intent to mislead can it avoid proof that the advertisement's audience was in fact misled.  *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989).  As to the final element, a plaintiff need not prove actual or likely injury from a false statement where it seeks only injunctive relief, as CertainTeed does in this motion.  *Id.* ("[A] competitor need not prove injury when suing to enjoin conduct that violates section 43(a) [(15 U.S.C. § 1125(a))].").

        For the remainder of this order, the court will consider proof of a Lanham Act false advertising claim sufficient to prove a CPA violation as well.  As noted above, Mr. Garcia's statements that would violate the Lanham Act but for their use in purely local commerce will also be deemed violations of the CPA

        The court now considers whether each of the statements CertainTeed challenges is false.  A statement is "false" within the meaning of the Lanham Act when it is either literally false or literally true but nonetheless likely to confuse or mislead customers.

ORDER – 12

1    *Southland Sod*, 108 F.3d at 1139.  A statement challenged as false must be "analyzed in

2    its full context."  *Id.*

3         1.      "real functional life . . . is only 10-15 years"

4         The court need not determine whether this statement is true or false, because it

5    cannot determine that this statement targets CertainTeed.  So far as the court can

6    determine, the statement appears solely in the April 2009 version of Mr. Garcia's

7    website.  Esler Decl., Ex. 4 (CT00778).  As the court has already noted, that version of

8    the website (at least as CertainTeed has presented it to the court) mentions CertainTeed

9    by name only in an unannotated list of nine manufacturers of roofing shingles.  *Id.*

10   (CT00776).  There is nothing in this version of the website that targets CertainTeed or

11   any other specific manufacturer.  Mr. Garcia notes that "the best [asphalt shingle] options

12   will last 20-25 years, the worst options have failed within 15 years."  *Id.*  CertainTeed

13   gives the court no reason to conclude that its shingles are the "worst options" to which

14   Mr. Garcia refers, rather than the "best options."  Although it is possible that a person

15   reading this version of the website would construe Mr. Garcia's statements to mean that

16   specific CertainTeed shingles would last "only 10-15 years," the court cannot make that

17   determination as a matter of law.  Accordingly, the court cannot grant CertainTeed's

18   motion as to this statement.

19        2.      Presidential Shingles "will not be able to pass a resale inspection after
20                15 to 20 years" and "most roofs fail in 10 to 15 years."

21        This statement that Presidential shingles "will not be able to pass a resale

22   inspection after 15 to 20 years" appears in the Dear Homeowner Letter.  That letter

23   undisputedly targets CertainTeed's Presidential products.  Mr. Garcia's website, as of

24   May 2010, stated that "most roofs fail in 10 to 15 years."  Esler Decl. (Dkt. # 46), Ex. 1

25   (CT00854).  That statement appears in a section in which CertainTeed is the only named

26   manufacturer, and includes unsubstantiated "examples" of more than 20 CertainTeed

27   roofs that failed in 10 years or fewer, along with the unsubstantiated statement that "one

28   ORDER – 13

1  roofing contractor reports submitting over 600 warranty claims to CertainTeed within the

2  last 4 years." *Id.* Rather than focus on a particular statement, the court will instead

3  consider them collectively by assessing the truth of any statement Mr. Garcia makes

4  contending that all or most CertainTeed roofs will not last beyond a particular term of

5  years or will fail a resale inspection[3] after particular term of years.

6      CertainTeed has provided evidence of numerous Seattle-area roofs shingled in its

7  products that have lasted more than 10 years and would pass an inspection after 20 years.

8  This is no easy task, because CertainTeed did not directly sell its products on the West

9  Coast until 1998. Gardiner Decl. (Dkt. # 33) ¶¶ 12-21. Presidential products were sold

10 by their previous manufacturer on the West Coast, but were always sold to distributors,

11 rather than directly to roofers or homeowners. *Id.* Despite the difficulties in tracing its

12 shingles to particular homes, one Seattle-area roofer provided CertainTeed evidence of

13 twenty roofs with Presidential shingles installed between 1991 and 1999. Ivers Decl.

14 (Dkt. # 34) ¶ 3; Haight Decl. (Dkt. # 35). CertainTeed examined several of these roofs

15 and took photographs, declaring each of them to be in good condition, and not in need of

16 replacement in the near future. Ivers Decl. (Dkt. # 34) ¶¶ 3-5; *see also* Gardiner Decl.

17 (Dkt. # 33) ¶¶ 19-20 (discussing 7 Presidential roofs between 16 and 19 years old).

18 Although CertainTeed provided the address of each of these roofs, Mr. Garcia has not

19 provided any evidence to prove that these roofs would not pass a resale inspection. From

20 this evidence, a reasonable jury could only conclude that there are Seattle-area

21 Presidential roofs between 16 and 19 years old that not only could pass a resale

22 inspection, but that would be able to do so after twenty years. Mr. Garcia's statements

23 are literally false.

24

25  _____

26  [3] Mr. Garcia repeatedly refers to "resale inspection." In his briefing, he explains his belief that
    unless a prospective homebuyer is told by an inspector that a roof will last at least another five

27  years, the homebuyer will not purchase the home unless the seller includes a roofing allowance
    of at least $5000.

28  ORDER – 14

Mr. Garcia attempts to prove that there are one or more Seattle-area CertainTeed roofs that are less than 20 years old and have deteriorated to the point of being unable to pass an inspection. His "evidence" consists of hearsay statements from unnamed roofers and other unnamed sources and his statement that he recently observed two CertainTeed roofs that would not pass inspection, along with the wholly unsubstantiated statements on his website. It is not likely that any of his evidence is admissible, but the court need not decide that issue. Even if Mr. Garcia could prove that there are one or more Seattle-area Presidential roofs that have deteriorated such that they would not pass an inspection in fewer than 20 years, he still would have no basis for declaring that *no* Presidential shingle could pass a resale inspection after 15 to 20 years, and no basis for declaring a specific lifetime for any CertainTeed product, much less a lifetime of ten years or less.

**3.      "History of premature failure"**

Mr. Garcia contends that he has factual support for his statement in the Dear Homeowner Letter that Presidential shingles have "a history of premature failure." There is no question that CertainTeed products, including Presidential shingles, have been the subject of "claims" by their purchasers. There is no question on this subject because CertainTeed has provided data on the "claims" it has received on its products, defining claims broadly to include virtually any kind of customer inquiry, from oral complaints to warranty claims. Gardiner Decl. (Dkt. # 33) ¶¶ 22-23; Kalkanoglu Decl. (Dkt. # 31) ¶¶ 32-37. CertainTeed's evidence, although not a model of clarity, shows that only a tiny percentage of its products are the subject of claims, and that the same is true of its Presidential products. Gardiner Decl. (Dkt. # 33) ¶¶ 24-27.

Mr. Garcia's best evidence for his "history of premature failure" statements is the evidence that CertainTeed has provided. As noted previously, Mr. Garcia has managed, for the most part, to produce only hearsay accounts from unnamed sources to support his claims of premature failure. It is likely, as noted previously, that none of this evidence is admissible. Mr. Garcia also contends that he personally observed CertainTeed shingles

ORDER – 15

in a state of premature failure on Seattle area roofs on two occasions.  Garcia Decl. ¶¶ 17-20.  There are many reasons to doubt Mr. Garcia's alleged firsthand experiences with "failed" CertainTeed products.  He has not provided an address for the homes, the names of the homeowners, or any other information that would allow CertainTeed (or anyone else) to test the veracity of his claims.  He has no photographs or other objectively verifiable information.  Assuming, for the purposes of this motion, that Mr. Garcia's hearsay and other questionable evidence provides evidence of some roof failures, his evidence is still much less probative than CertainTeed's own evidence.

The question before the court is whether evidence that a tiny fraction of CertainTeed's products have failed is sufficient to support Mr. Garcia's statements that the products have a "history of premature failure."  The court concludes that Mr. Garcia's statements are literally false by necessary implication.

A statement can be literally false on its face, or literally false by necessary implication.  *E.g.*, *Southland Sod*, 108 F.3d at 1139; *Time Warner Cable, Inc. v. DirecTV, Inc.*, 497 F.3d 144, 148 (2d Cir. 2007) ("[W]e hold that an advertisement can be literally false even though it does not explicitly make a false assertion, if the words and images, considered in context, necessarily and unambiguously imply a false message.").  A statement is literally false by implication if, read in context, it unambiguously conveys a literally false message.  *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 946-47 (3d Cir. 1993).  The key to invoking the literally-false-by-necessary-implication doctrine is that the implied statement must be unambiguous.  *Id.* at 947, *Time Warner*, 497 F.3d at 158.  An ambiguous statement cannot be literally false, and can only be false advertising if it is shown to be likely to deceive or mislead consumers.  *Time Warner*, 497 F.3d at 158.

Placed in the context of the letter in which it appears, Mr. Garcia's statement in the Dear Homeowner Letter that CertainTeed's Presidential shingles "have a history of premature failure" is false by necessary implication.  Standing alone, the phrase could perhaps be interpreted to mean that the shingles have had a few incidences of undesirable

ORDER – 16

performance.  But in the context of a letter that asserts that the products "will not be able to pass a resale inspection after 15 to 20 years," a "history of premature failure" is not the exceedingly limited evidence of undesirable performance before the court, but rather a body of evidence showing that CertainTeed products inevitably or nearly inevitably "fail"[4] to the point that they no longer function within 15-20 years.  There is no such body of evidence.  Mr. Garcia admits as much.  Garcia Depo. at 100-01 ("That all pumpkin tooth products start splitting apart at 15 years, I have no proof of that.  If this case is going to boil down to "do 100 percent of pumpkin tooth products split at Year 15 or about Year 15, then I'll concede the whole case right now.").

### 4.   That the Photograph Included in the Fox and Schell Letters Depicts a "failing" Presidential Shake.

Mr. Garcia offers nothing more than his own say-so to support his assertion in the Fox and Schell Letters that the enclosed photograph is of a "failing 'Presidential Shake.'" He has been asked both at his deposition and in discovery requests to provide evidence for his claim, and he has failed to do so, contending that his sources are confidential. Garcia Depo. 109-11, 115.  He failed to provide an address for the house so that CertainTeed could verify his claims.

Against Mr. Garcia's say-so, CertainTeed has offered the testimony of an expert witness who contends that the shingles depicted in the photograph are organic asphalt shingles, and thus not CertainTeed Presidential products.  Metz Decl. ¶¶ 23-32. Typically, the court does not resolve such factual contradictions in a summary judgment motion.  In this case, however, Mr. Garcia offers nothing to contradict Mr. Metz's assessment that the defects depicted in the photographs occur only in organic shingles.

---

[4] Mr. Garcia also suggests that the word "failure" is merely an expression of opinion, because what constitutes "failure" in one person's mind might not be in another's.  The court finds no merit in this position.  To anyone with a reasonable command of the English language, "failure" connotes a serious adverse event, and in the context of Mr. Garcia's advertisements, it connotes a roof that no longer functions.

ORDER – 17

Without such evidence, Mr. Garcia fails to raise a genuine issue of material fact for trial. His assertion that the photograph depicts Presidential products is false.

**5.      That Presidential Shingles Are "Part of" or "named products" in Class Action Lawsuits.**

In the Schell and Fox Letters, Mr. Garcia declares that "CertainTeed 'pumpkin tooth' products (Presidential Shake, Presidential TL) and the Landmark series of shingles are currently part of a class action lawsuit for premature failure."  In the Dear Homeowner Letter, Mr. Garcia states that "CertainTeed is currently in a class-action lawsuit (again) for marketing 'defective' roofing shingles – and that the Presidential TL is a named product in the class action lawsuit."  In the May 2010 version of his website, he declares that Presidential shingles (among others) are "involved in" class actions. Esler Decl. (Dkt. # 46), Ex. 1 (CT00853).

Mr. Garcia's statements are literally true.  Presidential Shingles (and other CertainTeed shingles) have been accused in numerous class action products liability lawsuits.  CertainTeed admits as much.  Garcia Decl., Ex. 3 at 14.  Those suits have been consolidated for pretrial purposes by the United States Judicial Panel for Multidistrict Litigation.  A consolidated settlement of those suits is apparently pending court approval.

CertainTeed argues that although Presidential shingles and its other fiberglass shingles were originally part of some of those lawsuits, the suits have since focused solely on organic shingles.  Even so, that does not change that Presidential shingles remain a named product in the lawsuits.  Even if the current settlement efforts focus on organic shingles, it is not inaccurate to say that fiberglass shingles (including the Presidential products) remain "part of" or "involved in" the lawsuits.

While CertainTeed cannot prove Mr. Garcia's statements about the class actions to be literally false, it may be able to prove that they are misleading, and that Mr. Garcia either made them with the intent to mislead or that they succeeded in misleading a substantial segment of their audience.  Indeed, it is likely they will succeed in proving as

ORDER – 18

much, given the context in which Mr. Garcia's statements appear.  On the evidence presented in these motions, however, the court cannot decide the issue as a matter of law.

**D.     Mr. Garcia's Efforts to Avoid Summary Judgment and to Obtain Partial Summary Judgment on His Own Behalf Are Insufficient.**

Before concluding its discussion of the summary judgment motions, the court considers Mr. Garcia's effort to obtain partial summary judgment as well as additional defenses he raises in an attempt to avoid summary judgment against him.

The essence of Mr. Garcia's summary judgment motions is that he is entitled, as a matter of law, to attack the durability of CertainTeed products because CertainTeed cannot prove the durability of any of its products.  For example, he contends that because CertainTeed cannot point to a CertainTeed roof in the Seattle area that has lasted more than 15 years, he is free to say that CertainTeed roofs cannot last beyond 15 years.  He is mistaken.  First, as already noted, CertainTeed has provided uncontroverted evidence of Seattle-area Presidential roofs that have lasted for 16 to 19 years, and are in no apparent danger of failing.  This evidence, by itself, shows Mr. Garcia's statements to be false, as previously noted.  But even if CertainTeed were unable to provide such examples, that would not give Mr. Garcia license to assert that CertainTeed roofs will not last beyond a certain period of years.  Mr. Garcia's theory of lawful advertising finds no support in law or common sense.  He can no more declare that "CertainTeed's roofs fail after 20 years, unless CertainTeed proves me wrong," than Pepsi can declare that "people who drink Coca-Cola die 20 years later, unless Coca-Cola proves us wrong."

Mr. Garcia contends that his advertisements do not express facts, but rather opinions about CertainTeed's products.  Mr. Garcia is correct to note that opinions cannot generally be the subject of a false advertising action.  *E.g.*, *Groden v. Random House, Inc.*, 61 F.3d 1045, 1051 (2d Cir. 1995).  His efforts, however, to cast his misstatements as mere opinion are not persuasive.  For example, he observes that CertainTeed's declarants have varying views about the lifetime of CertainTeed products.  He contends

ORDER – 19

that his observations are no more true or false than the views of these declarants.  He is mistaken.  The evidence shows that the lifetime of any roofing product, whether CertainTeed's or another manufacturer's, depends on a variety of factors:  the quality of the product, the manner in which it is installed, and the weather to which it is exposed, to name a few.  For these reasons, it is understandable that no one really knows how long a particular CertainTeed roof will last.  If Mr. Garcia's advertisements merely expressed these uncertainties, he might have escaped CertainTeed's lawsuit.  Instead, he expresses with certainty that all or most CertainTeed roofs will not last beyond a term of years he arbitrarily decrees.  These are statements of fact, not opinion, and he has no evidence to counter CertainTeed's evidence that they are false.

Mr. Garcia's advertisements do contain numerous statements of opinion.  For example, many versions of his website contain extended discussions about roofing product warranties, including CertainTeed's warranties.  The gist of Mr. Garcia's opinion is that warranties are deceptive marketing tools, because they imply to customers that the lifetime of the product is the term of the warranty.  Moreover, Mr. Garcia believes that warranties mislead consumers into thinking that a roof that fails before the warranty expires will be replaced, when in fact the warranties provide only limited coverage. These statements are either pure opinion or opinion marbled with facts that can be neither proven nor disproven.  CertainTeed has not challenged those statements.  Indeed, it has not challenged any opinion expressed in Mr. Garcia's website.

Mr. Garcia is also mistaken in his view that CertainTeed's own allegedly misleading or deceptive marketing practices excuse his own.  Mr. Garcia falls well short of proving false advertising on CertainTeed's behalf.  Even if he had, however, CertainTeed's alleged wrongdoing does not give him license to spread falsehoods.

There is much more that the court could discuss from Mr. Garcia's briefs.  He accuses CertainTeed of fraud, perjury, and more.  He refers to CertainTeed's witnesses as "shills."  None of these contentions warrant serious discussion.  Mr. Garcia has not

ORDER – 20

proven that he is entitled to summary judgment on any issue in this case, and he has not provided any valid defenses to CertainTeed's false advertising claims, except as the court has noted above.

To summarize its discussion of the five statements CertainTeed challenges as false advertising, the court finds three of them false as a matter of law.  All of them are undisputedly material to a customer's decision to purchase roofing products.  With one exception, those statements were made solely in letters to Washington homeowners, so the court declines to decide whether they were made in interstate commerce and within the scope of the Lanham Act.  The court concludes that these statements violate the CPA as a matter of law, but not necessarily the Lanham Act.  Mr. Garcia's website statements declaring, for example, that most CertainTeed roofs fail in 10 to 15 years, violate both the Lanham Act and the CPA.

The court will now consider Mr. Garcia's discovery misconduct, followed by a discussion of whether CertainTeed's partial summary judgment victory entitles it to a permanent injunction.

**E.      Mr. Garcia Has Refused to Fulfill His Discovery Obligations.**

CertainTeed served a set of interrogatories and requests for production of documents in September 2009.  Mr. Garcia's October 2009 responses, though timely, were woefully inadequate.  CertainTeed attempted to cajole him into providing complete responses, but was not successful.

CertainTeed filed a motion to compel noted for March 26, 2010.  Mr. Garcia filed no opposition to the motion.  On March 24 through March 26, however, he provided supplemental discovery.  The supplemental discovery addressed some of the gaps in his previous responses, but not all of them.

Two areas of deficiency in Mr. Garcia's responses are of particular concern.  First, he has failed to identify to whom he has sent letters that target CertainTeed.  Without knowing how widespread Mr. Garcia's advertising has been, CertainTeed is at a serious

ORDER – 21

1    disadvantage.  Second, Mr. Garcia has failed to provide evidence backing up his claims

2    about CertainTeed products.  In particular, he has failed to provide evidence as to the

3    provenance of the photograph he has been sending to consumers that allegedly depicts a

4    "failed" CertainTeed roof.

5           Rather than discuss each of Mr. Garcia's discovery shortcomings in detail, the

6    court simply finds that he has failed to provide discovery in compliance with the law.  He

7    has two options.  He can either provide such discovery at least one month before the trial

8    date in this matter, or he can face adverse evidentiary inferences at trial.  In particular, the

9    court will not permit him to rely at trial on evidence that he did not produce in discovery.

10   Moreover, to the extent that his failure to provide discovery has prejudiced CertainTeed's

11   ability to prove portions of its case, the court will instruct the jury to make appropriate

12   findings in CertainTeed's favor as a sanction for these discovery violations.  In addition,

13   the court will, on proper motion, impose monetary sanctions because Mr. Garcia

14   unreasonably forced CertainTeed to bring this motion to compel.

15          The court will accordingly remove CertainTeed's discovery motion from its

16   calendar, without prejudice to CertainTeed raising the same issues again in a pretrial

17   motion for evidentiary and monetary sanctions.

18   **F.     CertainTeed is Entitled to a Permanent Injunction.**

19          The court now turns to CertainTeed's request to permanently enjoin Mr. Garcia

20   from making the three false statements identified in Part III.C, *supra*.  Both the CPA and

21   the Lanham Act authorize injunctive relief.[5]  RCW § 19.86.090; 15 U.S.C. § 1116(a).

22          A party seeking a permanent injunction must satisfy a standard that "is essentially

23   the same" as the standard for preliminary injunctive relief.  *Amoco Production Co. v. Vill.*

24   *of Gambell*, 480 U.S. 531, 546 n.12 (1987); *see also Winter v. Natural Res. Def. Council,*

---

[5] As the court has noted, this motion does not require it to determine whether CertainTeed can invoke the Lanham Act with respect to statements Mr. Garcia made in letters.  Should this matter proceed to trial, CertainTeed will need to address this question, as there are substantial differences between the remedies that the CPA and Lanham Act provide.

ORDER – 22

*Inc.*, 129 S.Ct. 365, 381 (2008) (noting that a judge considering a permanent injunction must balance equities and consider public interest, just as if considering a preliminary injunction). The key difference is that a litigant seeking preliminary relief must demonstrate a likelihood of success on the merits, whereas a litigant seeking a permanent injunction has already succeeded on the merits. *Amoco*, 480 U.S. at 546 n.12. A permanent injunction, like a preliminary injunction, is an extraordinary remedy. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). Even after a litigant has succeeded on the merits, "a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Id.*

Because CertainTeed has succeeded in proving that three of Mr. Garcia's statements are unlawful false advertising, the court need only consider whether those statements will irreparably harm CertainTeed if not enjoined, whether the balance of equities favors an injunction, and whether the public interest favors an injunction.

CertainTeed has proven that it has been and will continue to be irreparably harmed by Mr. Garcia's false statements. CertainTeed has no way of determining who has received Mr. Garcia's false statements, or who will receive them absent an injunction. For that reason, CertainTeed can do nothing to correct the untruths that Mr. Garcia spreads. Even if CertainTeed could identify every member of Mr. Garcia's audience, it cannot stop the spread of the false statements, nor can it undo their damaging effect. Money damages are inadequate, CertainTeed has been irreparably harmed, and it will continue to be irreparably harmed absent an injunction.

The balance of equities favors CertainTeed. Mr. Garcia presents no countervailing equitable considerations that would weigh against an injunction to end the harm to CertainTeed. This is particularly so where nothing prevents Mr. Garcia from advertising his business without false statements. If he wishes to discuss what he perceives to be the disadvantages of asphalt shingles, he is free to do so. If he wishes to extol the virtues of other products, he is free to do so. If he wishes to point out that CertainTeed has paid

ORDER – 23

1    some warranty claims on its products, he is free to do so.  If he wishes to point out that

2    the period of CertainTeed's product warranty is tenuously related to the lifetime of its

3    products, he is free to do so.  If he wishes to criticize CertainTeed's warranty coverage as

4    inadequate, he is free to do so.  Why Mr. Garcia insists on using falsehoods is not

5    apparent, but it is apparent to the court that ending the falsehoods will neither end Mr.

6    Garcia's business nor prevent him from advertising it.  For that reason, the balance of

7    equities clearly favors an injunction against Mr. Garcia's false statements.

8            Finally, the public interest is undoubtedly best served by an injunction.  No third

9    party (except perhaps the roofers and manufacturers who are not the targets of Mr.

10   Garcia's falsehoods) benefits from the spread of his falsehoods.  Whatever choices

11   consumers make about roofing, they are best served by being able to do so in a

12   marketplace free of false statements.

13                          **IV.  PERMANENT INJUNCTION**

14           The court enters the following permanent injunction.  Defendant James Garcia is

15   permanently enjoined from making the following false statements in any advertising

16   promoting his roofing business (including Seattle RoofBrokers, all other "RoofBrokers"

17   businesses, and any other roofing business Mr. Garcia promotes):

18           1)  that CertainTeed products "have a history of premature failure;"

19           2)  that CertainTeed products will fail or will not pass a resale inspection after 15-

20               20 years, or any other statements in which Mr. Garcia represents that the

21               majority of CertainTeed roofs will fail or will not pass an inspection after a

22               particular term of years; and

23           3)  that the photograph Mr. Garcia has included in the Fox and Schell letters

24               depicts CertainTeed products.

25           Mr. Garcia is enjoined from sending letters or other direct communications to

26   customers containing these misstatements or other misstatements.

27

28   ORDER – 24

As to Mr. Garcia's website (whether at www.seattleroofbrokers.com or any other domain he controls), he has two options. He may, at the top of *every* page on his website, include a prominent hyperlink (of a font size at least as large as any other font used on the page) to an electronic version of this order. The text of the hyperlink shall include the following statement: "Please click here for court order finding that this website contains false statements." His website must continue to include these hyperlinks until he removes every false statement that violates this order, at which time he can notify the court that the false statements have been removed. If the court finds that the false statements have been removed, it will permit him to remove the hyperlinks. Alternatively, Mr. Garcia may take his website "offline," remove the false statements, submit the new website content to the court for approval, and await court approval before placing his website online.

The court emphasizes that it will conduct contempt proceedings if Mr. Garcia fails to comply with this order. It also emphasizes that to the extent Mr. Garcia "complies" with this order by modifying the words of his advertisements without modifying their unlawful message, he will nonetheless be subject to contempt sanctions.

Mr. Garcia shall comply with this injunction no later than July 12, 2010.

## V.  CONCLUSION

For the reasons stated above, the court DENIES Mr. Garcia's summary judgment motion (Dkt. ## 27, 28), DENIES CertainTeed's discovery motion (Dkt. # 22) without prejudice, and GRANTS in part and DENIES in part CertainTeed's summary judgment motion (Dkt. # 40). The court imposes the permanent injunction set forth in the previous section.

This matter is set for trial on August 2, 2010. In a June 9 minute order, the court vacated the mediation deadline pending the court's disposition of these motions. The court now imposes a mediation deadline of July 16, 2010. Mr. Garcia has submitted a declaration to the court in an effort to prove that he cannot afford mediation. As

ORDER – 25

CertainTeed points out, the declaration is vague, and there are reasons to doubt several of Mr. Garcia's assertions. If Mr. Garcia is to avoid any cost in this litigation, he will need to provide specific and substantiated evidence of his financial status. Nonetheless, rather than delay mediation while conducting further inquiry into Mr. Garcia's ability to pay, the court orders the parties to proceed to mediation. CertainTeed will pay the full cost of mediation. If CertainTeed chooses, it may request Mr. Garcia's half of mediation expenses as an item of cost at the conclusion of this suit.

As the parties prepare for mediation, the court observes that they both have much to gain from reaching their own resolution of this dispute. It is apparent that this dispute has engendered much ill will from Mr. Garcia toward CertainTeed. That ill will does not excuse Mr. Garcia's false statements, but Mr. Garcia can continue to target CertainTeed and its products via truthful statements or statements of opinion. The court's review of Mr. Garcia's advertisements suggests that many of his statements are either truthful or non-actionable opinion that will serve to discourage some people from using CertainTeed products. Mr. Garcia, on the other hand, should realize that on the record before the court, CertainTeed is highly likely to succeed at trial in proving that other statements Mr. Garcia made are misleading and injured CertainTeed, and is likely to prevail on its other causes of action as well. The cost of trial is thus likely to be very high. Not only will the trial itself divert Mr. Garcia's time away from his business, but the result of the trial is likely to further damage him via a verdict in CertainTeed's favor, and costs (including the cost of mediation) to be imposed against him. In short, there are many reasons why a trial might not be in either party's best interests.

DATED this 28th day of June, 2010.

*Richard A Jones*
_____
The Honorable Richard A. Jones
United States District Judge

ORDER – 26